David Rudofsky for the appellant Kevin Johnson. I've asked the court to reserve two minutes for rebuttal, and I appreciate the court's consideration of the number of issues that we have to address. Between us and the District Attorney's Office of Philadelphia, which is the appellee in this case, we've agreed to divide that argument. The court has ordered us to divide the argument. They will address in much more detail than I will. I'll give a couple of bullet points on the procedural default issue, which is a preliminary issue. I want to focus mainly on the merits of the Brady claim and the question of cumulative prejudice. Okay. Could I ask you to start then? We'll leave the procedural default and some of the habeas-specific issues for them, but one precondition. Yes. Okay. So one precondition of a Brady claim is, I mean, we've got the separate issue about what our earlier precedent was, but even setting that aside, a precondition is that the government has to be in possession, the VA or the police or something. I don't believe there's any evidence in this record that the government had Angela Smith's or Nixon's statements in its files. Am I wrong? Have you found it anywhere? Yes. And in fact, so in 2019, if I can jump from 2013 and 2014, when the defender was first appointed to represent Mr. Johnson and had raised a number of claims here, there was a fair amount of investigation done. We bring ourselves to 2019 with the new administration, which had an open file policy in terms of looking at both the district attorney's file, the homicide file, and so on. And it turned out at that point, when we examined that file, there was the 2016 statement of Angela Smith to a detective who had come to question Angela Smith about his earlier statements in 2014, in which he had said in his initial statements, we said, when I originally told the police when I was interviewed that night that I picked out this photo, I think it was Kevin Johnson, I can't be sure, and although the AG doesn't say this in the brief, I will identify him if I see him again. Where is that in the record of this hideous proceeding? So it's in the record because the hideous petition was amended to include that. And in fact, the AG concedes that at some point, Angela Smith, they say at the preliminary hearing, we say it was a trial. He was subpoenaed. He came into the courtroom. But you have to make an evidentiary record of that. Initially, there was going to be a, I think it was a third PCRA, whatever the latest PCRA was to make the record. But then that was withdrawn. Then there's a federal habeas petition. Original habeas petition asked for an evidentiary hearing. But the request for the evidentiary hearing was withdrawn. So you found these things, but they haven't made it into the record of the habeas proceeding. The record was in the PCRA. The district attorney has waived exhaustion. And therefore, you can look both at what was presented there, but as I say, the confirmation. Where was Angela Smith or Nixon presented? It was filed in the PCRA, but then there wasn't an evidentiary hearing, correct? Correct. And there wasn't a federal evidentiary hearing? That's correct. So you have not established the factual precondition for the Brady claim. You have a conception, but we don't have facts before us that establish this. You have the record in the PCRA. You have the amended. How's it in the record? The federal habeas. And you have the AG conceding that Angela Smith, they say at the preliminary hearing, we say at the trial, was subpoenaed, came in and said, I cannot recognize or identify Mr. Johnson, having said initially, having said initially to the police, I think that's him, but I can tell you that's his solvency. He's never said this in court, and we don't have a record of this being established to a court satisfaction that this was in the prosecutor's files. And there's the backup here. This could be remanded. The district attorney's. You remanded for an evidentiary hearing that you didn't ask for before the district court. Right. There was a request. We thought we had enough. The district attorney agreed on that. Then the AG was appointed as amicus. It was fully briefed. There was no disagreement on the factual claim that Angelo Smith initially said, initially said, I cannot. I think that may be him. I looked at him. I was in that room. If I see him again, I will identify him. And then we have the same witness. Right. This is exculpatory and impeaching, who says, I cannot. Judge Rubino said, if you believe that testimony, if you believe that testimony, not only does it impeach, it's exculpatory, and it undercuts the integrity of the entire investigation. Let's focus on the two witnesses separate. Nixon is dead, right? Nixon, that's right, but was deposed. Was deposed, but there's no point in an evidentiary hearing regarding Nixon because she's dead. No, I mean, the judge could look at the deposition. You're a wise advocate to be focusing on Angelo Smith. Our best understanding is Angelo Smith is probably alive in some county somewhere nearby. That's correct. He's in he's in mid-Pennsylvania when the district attorney was investigating this case after they opened their file. And we had this additional, very powerful, explosive evidence that they hadn't turned over, including the arrest photo, which showed him with a mustache. And Angelo Smith and James Smith both said, both said the we saw the perpetrator. He was clean shaven. He had no mustache. He was 6'1". He was only 5'6". But your brief didn't press the high point. But anyway, but but Angelo Smith's also the only one who did not know him before. We think he's available. He wasn't able to be found during COVID. I've been going on for a while. Judge Chum has been very patient. She has a question. Oh, I just I did have a question, given that there is some contest from the AG about the reliability of Angelo Smith's 2014 and 2016 statement. That statement being I went to court. I looked at him. I didn't recognize recognize him. I told him I told either someone in the prosecution team. That's correct. But given that the district court assumed facts without finding them and given that there is dispute about the reliability and given that the record shows that the trial court gave a sequestration order, which should mean that Angelo Smith was never in that courtroom. What are what do we do when we're review is de novo? Can we consider the reliability? So one option is renamed. But I think there was enough on the record here, given the way this case was briefed and the concessions that were made. We know that it gets tied up with this original description. Here's a person who's clean shaven, described as 6'1". His arrest photo shows him with a observable mustache and he's 5'6", more than a half a foot shorter. So the record we can look at ourselves, a Scott B. Harris situation. When I look at that photo side on, I'm not sure I'd describe the guys having a mustache looking forward facing. Yes, he does. But this is a situation where someone appears to have, like, tripped, pulled over out a limp cord and then the place is plunged into darkness. So, like, how impeaching is it that the district court, you know, was able to look at this even without a hearing? I'm not sure we need a hearing just for the photo. Because the other way, you've got three witnesses here. Remember, this case is purely on three eyewitnesses. There's no forensic evidence. There's no corroborating evidence. There's no evidence after a search of his house that anything was found. It relies on three witnesses. And your point, Judge Bebas, is how could anybody see anything there? Right. How could anybody see anything when as soon as he came into the room with a gun and you've got gun focus and within three or four seconds, the lights are out. Right. And then people come in and testify, that's him. Two of the witnesses, two of the witnesses say we saw him. He was. Why would you say he was clean shaven if you didn't have a chance to see him? The other witnesses said Ingelsmith, the others knew him from beforehand. Knew him from the neighborhood. But if they knew him beforehand, they could recognize him. You said Ingelsmith's differently situated. But then we got the corroborating recantations. Opal Nixon says, who may be their strongest witness, I knew him from the neighborhood. I didn't really know him. She says, I didn't know him personally. I knew him from from the neighborhood. She insists in her first statement to our investigator and then in a sworn deposition where she's very clear. She says it could not have been Kevin Johnson. The perpetrator was much darker skin. I know Kevin Johnson. I know him enough to recognize him. The perpetrator had a much darker skin than Kevin Johnson. It's not him. At her deposition, she's all over the map. I did. I didn't. I'm not sure. And that's why it's a jury question. And that's why under Brady and that's why under Brady, when you do cumulative prejudice. And my point about the procedural default and everything else is nobody has ever done a cumulative prejudice analysis. Angelo Smith saying the investigator was pestering me, as Nixon appears to have said, and I signed a blank piece of paper. And then he wrote this affidavit over it. The point is, as to Angelo Smith, when the detectives questioned him two years later, he reaffirmed it to the detectives. They never turned that over. Here you have a statement in 2016. Right. While the case was being litigated in the PCRA, while the habeas was stayed. He's questioned by a homicide detective, and he says exactly what I'm saying here. I went to the courtroom, and I think the facts show it was a trial. He gets paid for being at the trial for the two days. We know that from a witness fee application. There's no bench warrant that's ever issued for him. And he tells the detective exactly what I've said to you. I know that can't be the person. I saw him in the courtroom. This is before sequestration. This is before the trial starts. He just goes there because he's subpoenaed. He looks into the courtroom. He's there with Elijah Bennett. He says, Bennett says, yeah, there's Kevin Johnson. I looked at Kevin Johnson. Couldn't recognize him. Couldn't identify him. What more powerful Brady material could you need? Both to show the lack of integrity in this investigation. And then you have these three witnesses who you just pointed out, Judge Bebas, what could they see at all? Right. The lights go out. They've been drinking. They're high on crack cocaine. They are the worst possible witnesses. There's gun focus, which they all talk about. That's the entire prosecution case. The mustache seems to only be relevant to James Smith because he and Angela Smith didn't testify. So as to trial testimony, those two are the only ones who said clean shaven. So as to trial testimony, the rest photo is more on point for James Smith. That's right. It's mostly relevant to James Smith, but it also shows. Can you address, you know, you were talking a lot about lighting and ability to see, but it seems he's differently situated. He answered the door. There are questions at trial about, you know, how close he was at the door, the lighting. Can you talk about the impact as to James Smith and his different situation? Yes. So you ask this to James Smith. Clearly he is impeached because he says this is a person who I'm identifying. He had a mustache. I saw a mustache. I'm sorry. He was totally clean shaven. We know he had a mustache. He was clean shaven and identifies him as being six feet one. The arrest photo, and this is why we bring in the arrest photo as well, the arrest photo, which was never turned over, where the lawyer ineffectively did not get the arrest photo and didn't have it, the arrest photo shows him at 5'6", more than a half a foot shorter than the person they described. That's the only physical descriptions. The color of the skin, and that's what Opal Nixon says, was not the same. The height, which was a half a foot off, and most important, the question of whether he was clean shaven or not, that impacts the three witnesses who testified. And when you look at the three Brady violations, you've got Angelo Smith, who we've gone through, who says, that's not him, right? That's the witness, and gives a description about a clean shaven person. You've got Elijah Bennett, who's a very weak witness, who had mental problems, trauma. I mean, almost to the point where does it even matter? And when you see that, when you post up on the question under Brady, which is assuming there has been a withholding of certain evidence, and here we have three pieces of evidence which the defense did not have, through a combination of not being turned over by the district attorney, whatever, sitting there in their file. There's no question it's in their file. Okay, it hasn't been established in court, but let's assume we overlook that threshold issue of you're not having proof, and you have the burden of proof on that. We have Judge Rubino at the end of his opinion. First of all, he takes the photo issue head on, and, you know, so the photo is before him. But he says, well, the arrest photos are genuine, and starting at J72, the statements of the eyewitnesses are not particularly reliable, and he sets aside James Smith, says the other ones, like, they just change, they're all over the place, they keep varying, the investigator's harassing. So why the court, having considered this in the context of this, you know, in the context of miscarriage of justice, is there a reason for us to remand to him, or has he not already telegraphed his consideration of these recantations long after the threat, and Nixon is dead, and, you know, not we're past the point of liability for perjury, they're conceded memory problems. What is the added value of sending it back? Well, we can flesh out, and this is very important, we can flesh out the circumstances under which Angelo Smith gave his original statement. You've pointed out that they point out they said it was a blank piece of paper. There were two other witnesses at that point, including Judge Freeman, who represented, was at the Defender then, and represented Kevin Johnson. She was there. She could be questioned. There was another investigator. What Judge Rubino did was, in the first half of the opinion, it's a 70-page opinion. He takes this very seriously. He just didn't say, I don't believe anybody. He could have said that, and that's the end of it, right? Didn't do that. He said, on the Brady claims. I mean, he didn't really seem to assess reliability at all. Right, and where he went wrong was, you know, he looked at the photographs. He looked at Angelo Smith and said what he said was, the reason I'm going to deny relief on that is you didn't investigate it early enough. Well, there's no duty under Dennis, right? I mean, this is where he gets Dennis wrong and Banks wrong and says the defense had some duty to investigate that. He goes off on that. Let's set that aside. But you can show he does seem to say at the end, like, look, I don't think this stuff is reliable here in any event. Right, but he says that in context of the innocence claim. There are two claims here, remember, to get to a hearing now in federal court. One is the Brady, this great Brady claim. Can we cross-apply what he said about the innocence to the Brady? And you have a higher burden on the innocence. But I think when you read this carefully, and I read the same thing, and I said, well, why is he coming out a little bit differently here? That's when he's addressing the ultimate claim of innocence, and we know there's a very, very high threshold, right, in terms of our burden approved to show innocence. We think this record supports innocence. Every judge was troubled by this case. I think I can guess your answer, but can we cross-apply a reliability finding in the actual innocence context to the Brady context? I don't think you can. You have a different standard of proof. Because the first two-thirds of the opinion, three-quarters of the opinion, he addresses all three claims and says, yes, if that happened, there is stronger or somewhat weaker Brady claims. We know it wasn't turned over. It could have been helpful to the defense. But nobody does a cumulative analysis, right, of the prejudice. He only looks at the prejudice of one Brady claim, right, the photographs, and that's where he can say, well, given that the witness said. And so ultimately what a court has to do in this case, out of ultimate fairness, which is why the district attorney, I think, and they will speak for themselves on this, conceded that there were Brady violations when you do cumulative prejudice. That's their duty to look at it. Why they waived all defenses, the procedural defenses. And, by the way, in the procedural defenses. We're going to deal with it. I'm letting you go over time on your facts, not on their issues. They'll deal with that. Said at this point now in the Third Circuit, there's enough on this record. We didn't have the hearing. Send it back. The judge could do the proper analysis under procedural default on remand if you think he used the wrong standards. And as to Angelo Smith, he could have a full hearing. A judge could look at the deposition of Opal Nixon. That could be considered. And could then do what has to be done in this case, and maybe it's the district court first, to say, if I find the three Brady violations, which Judge Rubino found, if you believe this evidence, to do the cumulative prejudice analysis. You could do it as well. But I can understand the discomfort at this point, given facts that can be developed. And we're ready to develop those facts if it can be found in the district court. All right. Thank you, Mr. Redaldo. Thank you. We'll have you back on rebuttal. Thank you. Is it Cobra? It is Cobra. Are you dangerous? I'm sorry? Are you dangerous at Cobra? Sometimes, but not today. Good morning, Your Honors, and may it please the court. I'm Sarah Cobra. I'm from the Philadelphia District Attorney's Office, and along with Michael Garmisa, represent the Commonwealth of Pennsylvania in this case. I'd like to start by clarifying a couple of things that Mr. Johnson's counsel raised. We have not, the Commonwealth has not conceded a Brady claim in this case. What we have said is that if the recantations are true, if they are credible, then he has a plausible claim. But we have not taken a position on whether or not the recantations are true. All right. Now, Judge Rebrano seems to say at the end he sees real problems with the credibility of these recantations. Why, I mean, anyway, I talked about that with Mr. Radofsky. Why don't you go on to your issues about procedural default? Sure. So what I'd like to talk about is the fact that there are, there may be credibility issues with the recantations, but there also may be credibility issues with the initial eyewitness identifications. Okay. Are you going to talk about the procedural default issues in connection with that? I'm happy to answer questions about the procedural default. Okay. I'm sorry. I thought Mr. Radofsky said you were going to talk about that because it does seem to me Wood v. ordinarily we're supposed to take, you know, the party's concessions as part of the waivers or forfeitures of procedural default as part of the adversarial process. But we have a problem in that your office, you know, does not seem to have pursued the ordinary vigorous adversarial process, not just in this case but in a number of cases flagged by the Pennsylvania Attorney General's office. Why isn't this a situation in which the district judge reasonably says it's within my discretion, this is not the kind of situation Wood v. Milliard contemplated? I don't have to accept this. An abuse of discretion ordinarily gives a district judge a lot of flexibility. So why would he apply that kind of rule of thumb to this, you know, atypical if not extreme case of procedural, of your just giving up on all the procedural default? So, Judge Bevis, let me back up a little bit and first say that we agreed, we proposed a compromise and settlement in the district court because we believed that there was a, that if the recantations were true, there was a plausible claim. All right. But you did more than that. The Pennsylvania Supreme Court said you can't just concede these things on your own. You had a PCRA petition teed up to raise these issues. Then arranged for him to withdraw it without a hearing in the state court. Go to federal court, not ask for an evidentiary hearing, and just ask the federal court to rubber stamp this settlement. That is circumventing federalism and state court review. It's not promoting federalism to respect your compromise. It's cutting out the role of the state courts in overseeing the adversarial process. This is highly atypical. With all due respect, we were not involved in the withdrawal of the last filed PCRA petition. The last filed PCRA petition addressed only the claim regarding the suppressed arrest photos. The other PCRA, the earlier PCRA petitions were denied without a hearing based in part on our representations, but also because the district, because the PCRA courts apply a diligence requirement to their governmental interference exception to the timeliness rule. Because the court does that and the PCRA court is entitled to do that, although I would say that the Pennsylvania Supreme Court has acknowledged that in the language of the statute, due diligence does not apply to the government interference portion. It may still be an open question. But my point is that if the district court, if the PCRA court is applying due diligence exception, most Brady claims are not going to get a hearing in federal court. In this case, the Angelo Smith, Opal Nixon, and Elijah Bennett claims were all raised in a PCRA after the initial PCRA in which James Smith's recantation. But I think Judge Bevis' point is with the third PCRA petition, whether or not you were the one who withdrew, you didn't present the settlement agreement to the PCRA court. And is that, is it, is it not true that a PCRA court would not accept your settlement agreement under Pennsylvania law? I do not, I do not know the answer to that question, but I do not believe it is true that the, that a PCRA court would not accept it. Well, hasn't the PCRA court said, we always review the issues independently. So they wouldn't simply just accept a settlement agreement. So that is true, Your Honor. There needs to be some sort of claim upon which the court can. This settlement agreement was never presented to that PCRA court. And that was a decision by your office. Once the PCRA petition was withdrawn, the PCRA court no longer had jurisdiction. And it was withdrawn without, with prejudice. They could not refile it in the state court. Okay, it may not have been your particular fault. We don't have a judicate fault here. But the effect of this winds up being circumventing what would have been ordinary review, including guidance from the Pennsylvania Supreme Court cautioning the ability of adversarial parties to bypass evidentiary hearings and procedural rules. And so that's a federalism issue that is not present in your run-of-the-mill wood-versus-milliard forfeiture case. It suggests that Judge Rubrino might have been right, even though we shouldn't be licensing judges willy-nilly to disregard waivers or forfeitures. But this one looks awfully different from the typical case. But, Your Honor, the one claim that had been presented in that last PCRA petition that was withdrawn was the arrest photo issue, which for which the court did accept our waiver. Okay, I've got it. But maybe these other claims should have been presented to the state court. You know, and Judge Rubrino was discriminating in deciding which waiver to accept, which not, which seems to track his analysis of which pieces of evidence might give you pause and which he really kind of brushed aside. The decision that Judge Rubrino made was to not accept the waivers for the two claims that the state court had said were procedurally defaulted, the two Brady claims. Nixon and Angelo Smith. Correct. Because there had not been due diligence on those claims. That's why the PCRA court rejected those claims and rejected a hearing on those claims. And Judge Rubrino honored the court's decision in that case. The reason that we waived that procedural default was because Johnson didn't have a forum in which to present his Brady claims. Johnson has presented claims to the PCRA court. He has never been afforded a hearing on any of these claims. And you, Judge Bibas, were acknowledging that none of this is directly before the court, and that is because state courts and the district court both denied hearings. We believe that a hearing is. Denied evidentiary hearings. I thought, and I thought Mr. Rudofsky acknowledged, that there was no evidentiary hearing because the most recent iteration of the There was originally an ask, but it was withdrawn, and the latest version just said, bless this, was settlement. No, Your Honor. So when we presented a settlement, we also, we recognized that the court did not have to accept the settlement. And we alternatively asked for an evidentiary hearing. A hearing on the settlement. No, Your Honor, a hearing on the claims. Okay. Because, as I said, we did not concede that meritorious Brady claims have been proved. Right. So we, I'm sorry. As to an evidentiary hearing, Mr. Rudofsky was asking for remand to have that type of hearing. Is there a bar? Can you overcome the bars to those evidentiary hearings? And do you intend to waive those bars? You're asking whether 2254E2 bars. So we don't think that there's been any assessment of whether Johnson was diligent. Certainly, the district court didn't make such an assessment. The state court has said various claims. We did not, or Johnson did not act duly, diligently. But that is a very fact-specific issue that probably should be resolved by taking evidence regarding diligence. Except the phrasing of 2254E2B says, if you failed to develop a factual basis, tell me if you argue that you failed, no hearing unless the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable fact finder would have found the applicant guilty. Hasn't Judge Rebreno, at pages 72 to 74 of the appendix, already decided that it does not meet that high standard? That's even higher than the schlup miscarriage of justice standard. Yes. We're not taking a position at this point on whether Johnson has failed to develop his claims in state court. And that is in part because the courts repeatedly denied evidentiary hearings. So we think it is an open question here that there needs to be evidence presented to determine whether or not Johnson was duly diligent in federal court. All right. Anything else? Thank you. Thank you. Mr. Eisenberg, I've been flexible with your adversaries and will be flexible with you on time as well. Thank you very much. Take your time. May it please the Court. Ronald Eisenberg for the Office of Attorney General. I'll go in the order of the arguments presented so far, Your Honor, and start with the substance of the Brady claims. I think it's important to start with the photo claim because it's been argued that it affects all the other claims. And I think it does, although in the opposite way from that which has been argued. It's said that a picture is worth 1,000 years, Your Honor, given 1,000 words, given the briefing, amount of briefing in this case. I think it's fair to say that the pictures here are worth several thousand words. But the most important picture is not the arrest photo, which was taken two days after the crime. It's the identification photo that was identified by every one of the four witnesses, picked up by every one of the four witnesses, one day after the crime, less than 24 hours or about 24 hours before the defendant was arrested and his mugshot was taken. Those photos are in our supplemental appendix. They are reproduced in our brief at the bottom of page 24. And the reason that that identification photo was so significant, Your Honor, is because placed side by side as we have in our brief and in our supplemental appendix, those photos are essentially identical. The same very faint mustache that the defendant now relies on as being exculpatory in the arrest photo on October 10th is present in the identification photo. It's not only exculpatory because he had a mustache versus clean shaven. It's also exculpatory because it reflects that he had it on the date of the robbery, which is different, which would not only call into question the witness's identification because of the difference between clean shaven and a mustache, but it would suggest that there's something more to his alibi defense. In other words, he's not the actual person who did it because he did, in fact, have a mustache. Yes, Your Honor, if one assumes, even despite the entire context of the evidence, that the witnesses were unable to accurately identify him because of the mustache claim, and that's why I think the contrast between the two pictures is so significant. Well, it's not that they would be unable to. It's just what alibi. The reliability would be materially reduced, Your Honor. And our point is that every one of the witnesses was able to pick out the defendant the morning after the robbery, hours since they had seen him, less than 12 hours for most of them, despite the faint presence of that mustache. So two, as Your Honor observed before, two of the witnesses, Angelo and James, said clean shaven. The other two didn't say that, so it doesn't affect them. Angelo didn't testify, so it doesn't affect him. So we look at James' one statement about clean shaven in the context of everything else that James did and everything else that the other witnesses testified to and that they did. That's why there's not materiality here, Your Honor. If we had a proceeding where we had everything that we have now, all the evidence we have now, and that's what the materiality standard requires us to look at, plus now the October 10th arrest photo. And at that proceeding, a jury was shown the arrest photo and say, oh, but look here. On October 10th, he had a mustache. Obviously the Commonwealth is going to stand up and say, but look here. When they identified him on October 9th, they saw or perhaps didn't see that. There could be cross-examination, but it would be tested, it would be given weight. And I think the main thrust of Mr. Johnson's argument is it's cumulatively with, you know, that this doesn't necessarily bring it across the line, but cumulatively. But the cumulative analysis, Your Honor, doesn't just cumulate the other allegedly exculpatory evidence. It accumulates all of the other evidence. And that's the problem with the continual resort to cumulative prejudice, Your Honor. The jury would have been required, in essence, by this claim, to look at those two photographs that are in our brief side by side and said, do you believe that the people who identified this person on the left as the perpetrator couldn't have reliably, totally reliably recognized him because what he actually looks like today or at the time and at the time of the crime is this person on the right. Okay, Mr. Eisenberg, you've dealt with the photo. Mr. Radofsky wisely did not press the Nixon claim. Angela Smith, the question is, does Angela Smith add materially to the photo such that, okay, maybe the photo on its own we can explain, but if Smith's stuff was in the file, if it had been turned over, maybe that gets him over the line. Why don't you explain to us your position on Smith and why it doesn't move the needle? Very well, Your Honor. And one final point with permission on the photo. As Your Honor brought up, the question of evidence that the defendant was actually, that the material was actually suppressed, that the defense didn't have it, that's a problem with the photo too, Your Honor. There's absolutely zero evidence here that the defendant didn't have, the defense didn't have that October 10th arrest photo. There's no offer to prove that. There's no way to prove that. Counsel is dead. Okay, but there's normally a Brady requirement to turn stuff over. I mean, set aside the dentist, pre-dentist debate, ordinarily you're supposed to turn everything over you got and not say, well, he has it or he knows it. Everything that the prosecution has reason to believe is exculpatory, Your Honor. Well, when you're dealing with identification, isn't the fact that he could not identify the defendant when he walked in the courtroom exculpatory? Your Honor, the point is that the defense always knew that Angelo wasn't going to make an identification. He didn't do it, a positive identification. He didn't do it at the time of the initial interview. And most important, a point that the parties, the other parties have ignored in this argument, Angelo testified at the suppression hearing. The trial court noted that at page 1237 of the joint appendix. That suppression hearing was reserved for the time of trial, and it occurred just days before the trial, possibly even the week of the trial. The jury was sworn on a Wednesday. And so everybody there, the judge, the prosecutor, the defense attorney, the defendant, had seen Angelo testify about his identification in court, in person, with the defendant sitting there. Now, we don't have that transcript, and the defense says, well, that's the prosecution's fault because they should know to turn over exculpatory information. The transcript is the transcript. It was not our obligation to somehow turn over the transcript. It was obviously available to the defense at the time. And the reason it's no longer available is because the defense waited so long to raise this claim that the transcript was lost. That could be an ineffective assistance problem, Paul. Yes. I mean, it could be, but it's not. I had an ineffective counsel for years and years. There's no claim that counsel was ineffective in allowing the transcript to be lost. Well, I'm looking at the case. The counsel was obviously ineffective. I'm sorry, Your Honor. Looking at this case, the counsel was obviously ineffective. I don't think so, Your Honor, and I'm not sure in what respect you mean that. There's only two ineffectiveness claims raised here. One is the photo, the claim that counsel should have gotten the photo, which I think contradicts the Brady claim as to the photo being suppressed. And the other is a failure to interview Angelo, not a failure to secure the transcript or anything like that, but a failure to interview Angelo so as to possibly use him. Our point, Your Honor, is that using Angelo was not an effective assistance, and, in fact, had Angelo been called by the defense, that would probably be an ineffectiveness claim now, and that would be the one that we would be arguing. Because if Angelo had been called to come in and say, I can't identify that guy, but, yes, he is the person whose photo I picked out of a book of hundreds, that's the only photo I picked out, that evidence on balance is not helpful to the defense. In and of itself, it does not have to be, but it can be cumulative. And the fact that there was no effort to find it, and the fact that it was not released by the prosecution, I think, is clearly a Brady violation. And it's a Brady violation that does not have to result in an acquittal, but has the potential of influencing at least one juror on the jury list. And I find it very difficult to excuse the failure to produce that. Yes, Your Honor. As you say, look at the cumulative effect, but my point is that that goes both ways. And you have to look at all the evidence as a whole, not just the alleged. Why not send this back for an evidence you're hearing? I mean, they may not have asked for it timely, et cetera, but, you know, what do you make of the argument on the other side that Judge Rebrano was not really looking straight on at this as Brady evidence in terms of its materiality, went off on the procedural grounds, and that we shouldn't, that the stuff about innocence Mr. Radofsky argues was enforced is under a much higher standard. So the findings are not particularly reliable. Maybe he'd look at it differently if he was looking at it as a straight Brady claim. Your Honor, the judge looked at these claims under the cause and prejudice standard. He applied essentially the Brady materiality standard in doing that. That was his understanding of what he was doing. So in finding that there was no cause and prejudice, he found that there was no materiality. And the problem with him, there are many problems with having a hearing now. One, the first one, is the legal one that Judge Chung brought up, which is 2254E. Now, there are two problems with 22, even within that legal category of 2254E. One, as Your Honor mentioned, is the actual innocence prong. The judge has already made a finding on that point, and even without that finding, I don't think that there's any conceivably strong claim that the claims here meet that very demanding standard. Indeed, the prosecution, by reserving the right to retry, is implicitly taking a position that he doesn't meet that standard. Yes, Your Honor. That's a very good point. They have acknowledged in the settlement we're not sure that he's innocent, so obviously they don't think that he meets that standard. And the other is the diligence standard, Your Honor. And there's been a lot of talk about diligence today, a lot of assertions that under Dennis there's no such thing as diligence. Well, that's not the law of this circuit, Your Honor. Okay. Dennis may be outdated. I mean, you know, the Supreme Court has not recognized his diligence. Let's assume that there's not a diligence requirement under Brady. If that's right, did he really have a forum, a State court forum, that he failed to use here if the PCRAs just wouldn't consider this? Well, I don't think you can assume that there's not a diligence requirement, Your Honor, because the Bracey case, which interpreted this Court's Bracey case, which interpreted Dennis just a few years ago, was very clear on that point. Here's just one sentence in the conclusion of the discussion. As far as Brady claims go, due diligence requirements remain substantial. If there is a reasonable basis for a Petitioner to believe that additional investigation will yield Brady material, that Petitioner must investigate or else risk the statutory consequences. Now, I think there are at least seven other statements of exactly the same nature in the Bracey claim. So there is no question, as a matter of circuit precedence, that there is a diligence requirement still. I'd like to hear you talk at some point about Wood v. Milliard. And, you know, this is not just a forfeiture. This is an affirmative waiver by the DNA. I'm sorry. Before you go on to that, take Judge Chung's point, please. To follow up on some of this, I just wanted to clarify, you said the suppression hearing transcript wasn't ordered. Is there any? That's not what I said. I said we have no idea what happened to the suppression hearing transcript. It's more of a fact question. Does anyone know if Angelo Smith identified the defendant at the suppression hearing? What we know, Your Honor, and thank you for that question, what we know, Your Honor, is that a mere few days after he testified at the suppression hearing, the prosecution said, I'd like to put him on a trial. And the court said, to say what? And I think what prompted that question was the court probably knew that, in fact, at the suppression hearing he hadn't identified the defendant sitting there in the courtroom. And the district attorney's response, they say that there's been no offer of proof was made. But the offer of proof is in the appendix at 1173 through 74. Angelo Smith would simply relate what happened in this incident and say that he was shown several hundred photographs, which he viewed for about half an hour and then picked out a certain photograph as looking like the man who did the shooting. Nothing about being able to make an identification. And I think the reason for that is because everybody knew that he wasn't going to be able to make an identification. One more fact question. That does help me. Thank you. The district court said the state court below found no Brady violation with regard to Angelo Smith's statement. And that was at note 27. What is that referring to? I'm not sure what that's referring to, Your Honor. What actually happened was the state court found that there had been a lack of the necessary diligence consistent with the Bracey case, this court's Bracey case, as to the Angelo and Opal alleged recantations that were done in 2014. So you're not aware of any merits addressing it? I'm not aware of that. But I do think it's important to look at what the state court said about those claims and why they were defaulted. The essence of those claims was that the police coerced the witnesses into picking out Kevin Johnson's photograph. They threatened them with charges. The problem is there had been an earlier PCRA petition, three altogether, Your Honor. The one that I'm talking about now as having been dismissed for time on diligence grounds was number two. But in number one, there was an alleged recantation offered from James Smith. And in the James Smith recantation, he said, or alleged to have said, the police pressured me into picking out Kevin Johnson's photo, even though I didn't think it was him, because they were threatened to charge me. And the state court judge, this is in the appendix at pages 1673 through 74, said, well, then you did have a reasonable basis from 2001 to believe that there was, there could be Brady material about these other witnesses. In fact, as the district, as the state court observed, the theory at trial, one of the theories at trial was that the police had suggestively caused these identification thefts, but the whole suppression litigation was about. The defense claimed that the police somehow pressured the witnesses into picking out the defendant falsely. So the state court said, given those facts, you did have a reasonable basis to believe that this, the information that you now give me in 2016, 14, I think the date of those statements was, might have been available, and yet you waited 13 years. That's the lack of due diligence that the state court relied on, and that's exactly the kind of diligence that the Bracey court says is appropriate under Brady and under the federal time bar, and thereby under the state time bar, which is the exact mirror of the federal time bar. The language is the same. But if he wasn't diligent, then he failed to develop it, and then he runs into E2. That's correct. And there's another point, Your Honor, and that goes to the arrest photo, which is the third PCRA petition. As you've heard, the argument is that that photo and the existence of that photo affects all the other claims, and certainly the potential testimony of every other witness would have been relevant even to the arrest photo claim. But we didn't have a hearing on that, and there might have been. There might have been. They might have survived the time bar argument, but we didn't have a hearing on that because the petition was withdrawn. Now, the district attorney's office has said that the — that was not their doing. But, in fact, in the settlement agreement that was offered to Judge Robrano at JA317, there's a footnote specifying that the withdrawal of the state court petition was part of the agreement, and in that same sentence, respondents are waiving their exhaustion defense. So the waiver — The withdrawal of the state court petition was part of the agreement with the district attorney in Federal 1. It's explicitly stated that — This is contrary to Ms. Cobra's representation. Part of the agreement. As part of this agreement, Johnston has withdrawn that petition, and as later noted, respondents are waiving the exhaustion defense, JA317 footnote 1. So getting back to the question of whether to have a hearing now, you know, to somehow deal with all of this mess, there's the legal problem that there's no diligence and no actual innocence. But there's also a factual problem, which is there's no evidence. And, in fact, after the concession was offered to Judge Robrano, he held a status hearing, and that — the transcript of that hearing is not in the joint appendix, but it is in the record. It occurred on September 22nd of 19 — of 2022. And at that hearing, the parties urged him not to have a hearing. And in doing so, they said — the district attorney said, well, we haven't been able to speak to any of the witnesses who testified. That's at page 31. The defense said one witness is now deceased, and the others — I'm quoting — that literally say, I have no memory. That's at page 33. Now, there's additional discussion earlier about the hearing. But the positions of the parties were very clear at that point that there should be no hearing. The court said he was not comfortable with that. He cited to the Pennsylvania Supreme Court opinion that the court has mentioned, Commonwealth v. Brown. And he said, I think I need to bring the attorney general's office in. The party said, let us give you more briefing. In that briefing, the district attorney's office said, on the very last page, in the very last sentence, after arguing at length for why the settlement should be accepted, said, well, in the alternative, maybe you should have an evidentiary hearing. That's J.A. 353. Then the attorney general's office filed our brief, and the parties were allowed to file an additional brief. And the district attorney's office filed a new brief, which actually backtracked somewhat from that evidentiary hearing claim. And in that brief, this is J.A. 529, they asked for a hearing on the actual innocence point, only on that point. Now, be that as it may, the district attorney, despite the fact that it has been presenting arguments on behalf of the defendant, is not actually the defendant. And as Your Honor observed, the defendant withdrew the request for a hearing and never reiterated that before the district judge. And if I recall correctly, never mentioned another word about it until, for the first time, his reply brief in this court. So there shouldn't be a hearing where the law prevents it, where the defendant, the petitioner, withdrew the request and never reiterated it, and where there's no evidence, as the parties themselves told the court. Now, they've backtracked somewhat from this absence of evidence claim, but with no grounds, with no basis, with no offers of proof. There's been apparently no effort whatsoever to contact those witnesses who might still be alive. We know for sure that two are dead. We don't know for sure about the other two. And despite all this time, it's now been four years, more than three years, since the settlement was offered. Nobody says, oh, we've gone out and found them. We know they're still alive, and here's where they are, and we'll try to talk to them. The only thing that the record shows is that they did try to talk to them, and the witnesses either weren't available or, as the defense represented to Judge Robrano, they literally say, I have no memory. And nor are the other parties. The defense lawyer died in 2006. The district attorney who handled the preliminary hearing died several years ago. The district attorney who tried the case died. All the parties who have direct knowledge are dead or, as we've been told by the parties, unavailable or without memory. I heard reference to Judge Freeman. Judge Freeman is not a part. I don't know if the parties spoke to Judge Freeman about making her a witness in this case, but she has no direct knowledge of any of the events here. She was at the deposition, yes, but the reason the party said we need to take a deposition is to preserve the testimony of Ms. Nixon, and that's what the deposition is for, and as Your Honor has pointed out, it's all over the place on every point. There were many points where she said, for example, well, no, actually, I don't know who did it. I don't know if it was Kevin Johnson or not. How would I know? I was high. So at the same time that she's saying it couldn't have been him in the very same deposition, she repeatedly said, I don't know if it was him. I'd like to address the waiver point, if I may, Your Honor, that's been raised, and I certainly agree that under the unusual circumstances of this case, the judge at the very least had discretion to deny the waivers, to disregard the waivers, because this is not the typical case that is addressed by Wood v. Milliard, and it is complicated, as the Court's request for supplemental briefing mentions. It is complicated by the participation of the Office of Attorney General here. The parties have responded by saying that under the state's Commonwealth Attorneys Act, the Attorney General doesn't have that power. And normally, the DA runs criminal litigation, and you tried to draw a formalistic distinction, but functionally, habeas litigation is treated as the DA's province. The DAs normally defend habeas and PCRA and all of that. So, you know, we would, there's a thumb on the scale that the DA gets to run the show here. Why not follow the usual course? There's an historical practice, Your Honor, but when push comes to shove, and it normally doesn't, when push comes to shove, then the Court is faced with the question that was raised in the supplemental briefing. What do we do when we have the DA on one side and the Attorney General on the other side? And the answer is, you have to turn to state law, Your Honor. And as we've pointed out, the Commonwealth Attorneys Act does give us a right to be here. Should we refer to the Pennsylvania Supreme Court the issue of, in a quasi-criminal habeas proceeding, whether it's the district attorney or the Attorney General who should be the main power to regulate it? No, Your Honor, I don't think that's necessary because I don't think that there's really a viable state law question. The state law is clear that civil litigation, in civil litigation, the Attorney General has predominance. The only question, then, as Your Honor's phrasing suggests, is whether federal habeas litigation is civil litigation. And that's a federal question, not a state law question. And I think the federal law is quite clear that habeas is civil litigation. If it weren't, if it were criminal litigation, I don't think that's. It does seem like, though, that's a matter for the state ultimately to decide how it's going to categorize and allocate its authority. Yes, Your Honor, and normally these kind of conflicts don't arise. And they arise now, as you pointed out, because of the unusual position taken by the district attorney's office in this and in other cases. And we've cited another case involving civil litigation in a conflict between the same district attorney's office and the Attorney General's office, a recent decision by the Commonwealth Court that says where there's a conflict, where there's an inconsistency, we have to go with the Attorney General. Because, yes, under the Act, the district attorney is the chief law enforcement officer of the municipality or county, but the Attorney General is the chief law enforcement officer of the Commonwealth, and it's the Commonwealth which is in question here, and in every criminal case, certainly, and certainly in a federal habeas case which is brought against an agency of the Commonwealth. At the very least, though, Your Honor, this certainly, these difficulties certainly take the case out of the normal Wood v. Millyard situation. Does it even matter, though, since the district court analyzed cause and prejudice? Does it matter? As we said in our brief and as I implied as I started out this morning, Your Honor, I think the simplest way to resolve this case is to deny relief on the merits of the Brady claims. But if the court weren't, and the court can do that under the federal habeas statute regardless of any defaults, but the court can't grant relief regardless of defaults. The habeas statute is very clear on that. So if the court thought it should be granting relief on the merits of the Brady claims, it would have to address the waiver problems. All right. Thank you. Thank you very much for your helpful submission. And I'll turn to Mr. Radofsky for his rebuttal. Let me address this last point. However you look at the question of whether the AG or the ADA has the power, and we say, as Judge Bevis said, all the indications, Harris v. Pernsley, Carter, this Court's decisions, the Pennsylvania Supreme Court decisions, they've waived it. They didn't argue when they came into Zemeckis that they had the power to do it. That wasn't raised. They didn't argue in their initial brief. They waived it there. They're talking about a waiver here. They waived that argument. In addition, as to the question of the appropriateness of a judge rejecting a waiver on procedural default, the cases all point to say that probably doesn't have that power. What happened here is that the AG said that's a moot question. They didn't even try to defend what Judge Rubino did, and they said he did do a merits analysis and did do a cumulative prejudice analysis, completely false. What Judge Rubino did was to do a merits analysis and then say you had some duty to investigate this on cause and prejudice, which is an exception to procedural default. There's cause and prejudice here under our allegations. What Judge Rubino said was, well, I don't think there's cause and prejudice because the defendant, from the very first start of this case, which was the misidentification case, had the duty to investigate whether or not there was coercion. There was no evidence of coercion for many years. Could I ask you about 2254E2? Yes. If the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows new retroactive rule you're not claiming or a factual predicate that could not have been previously discovered through the exercise of due diligence and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense. That's right. That means Shin is not jurisdictional. There is this exception to Shin here, which is why this court would have the power to hold an evidentiary hearing. And when you examine what the arguments are under E2, and we can do further briefing on it if the court wants it because it's just come up on this question of whether there ought to be a remand. On that specific question, this was a case that the defense lawyer, who never even saw his client until the night before trial, was misidentification. It wasn't coercion. There was no evidence of that. What they argue is the reason you should have investigated it is because you had Angelo Smith saying at some point that I can identify him later. You can't satisfy the 2254E2 standard. Your entire argument is that the DA has the power to waive that. That's right. Not only do they waive it, but the point is in terms of E2, our point is that there was no basis. Do you contest what Mr. Eisenberg said? And the State court dismissed it all. I'm sorry. I'm sorry. Please pause while I ask a question. Yes. Mr. Eisenberg says you never asked for this hearing. There are a couple places in the record he cited where the DA at JA355 asked for one, then backtracked at JA529, hearing only on actual innocence, not the fault. But throughout these, you were not asking for an evidentiary hearing. So you're saying now we should write an evidentiary hearing that you did not ask for it. Is Mr. Eisenberg wrong in his reading of the record? I think that is wrong. Where in the record is he wrong? If you're talking about the exchange that happened with Judge Rubino, once we withdrew the – and this question that somehow the withdrawal of the PCRA was some nefarious act, that it was forum shopping, Judge Rubino responded to that and said this case has been delayed long enough because the State court had never given a hearing on any of it and had decided the case was on the wrong grounds. I'm going to take jurisdiction, rejected the question of forum shopping. What was presented initially to Judge Rubino was an agreement between the parties that if habeas was to be granted, and we made very clear under Brown he could hold a hearing or decide it on the merits, if habeas was granted, that it would go back to State court. He would plead guilty or no contendere to third-degree murder. What Judge Rubino said at that status hearing, he said, I don't think I have the power to tell the State court what to do. I have the power to grant habeas or not, and that's what I'll address. And we went back and briefed it and said, you're right. We're not asking you at this point to tell the State court what to do. That's what we'll present to the State court if habeas is granted. On the question at that point of whether there ought to be a hearing before Judge Rubino, now we know he said you're not going to get a hearing because the procedure defaulted. He was wrong on all of that. We said given the fact that the record had been developed, we had the deposition, we had the – and by the way, there are pleadings here that the district attorney put in on this question of when you said there's enough of a record on that. There is. You have the photographs that were added. You have the 2016 statement that was admitted to the record. It's all part of the appendix. What Judge Rubino did at that point was to – and what our position was, given the exhaustion, the waiver of exhaustion, there's enough on this record for you to decide that there was three Brady violations, and when you looked at the cumulative prejudice, that's enough. But you did not ask for a hearing. We said we think that's enough. Obviously, we said it's your call as to whether it's a hadest violation. It's your call as to whether there ought to be a hearing or not. That's the way it was left. It was all discretionary. And then you can tell from his opinion where he went, right? And the problem was we've never had that cumulative prejudice analysis. And the final point here is on Angelo Smith. Our point is even standalone, even standalone. What the AG keeps saying is he initially picked out this photograph and he said, I think that's him. What they leave out is his most important statement, if I see him again, which I have to do to be sure, I can identify him. And we know from the AG's own concession, he saw him again in the courtroom and said to a member of the prosecution team, that's not him. There's the critical evidence put together with the photographs and the old Paul Nixon question. You've got all these recantations which are reinforcing color of the skin, height, lack of clean shaven when there was a mustache, this chaotic situation. Mr. Eisenberg's right. It's not only what we can show as to the Brady violations, it's whether there's enough evidence to say it doesn't matter, there's not a reasonable likelihood of a different result. When this case is based on a two or three second view of people high on crack, high on alcohol, three witnesses who see him for about three seconds before the lights out, give physical characteristics which are inconsistent with Kevin Johnson, and they can't have it both ways. They can't say, well, maybe they couldn't see the mustache, because if they couldn't see the mustache, what could they see, and why do they identify them? And, again, this case was tried by a lawyer solely on misidentification, not coercion or anything else. And that's why at this point we agree you would have the power to look at this and say it is enough and order habeas relief, or the more prudent view would be it goes back for hearing, and we think under E2, Shin is not jurisdictional. It's a question of whether the state court made the right ruling on diligence, and there was no factor to indicate to a defense lawyer who never spoke to his client until the night before a capital trial and has nothing in his file about this, nothing to indicate that there'd be any reason for the defense to do it, and the state court dismisses all the claims on the lack of diligence in violation of Dennis and Banks. Banks says under Brady it's not hide and seek. You've got to turn them over. Anything in your file. And in 2016, my final point, detectives interview Angelo Smith. He reaffirms everything he says, including I told them I had to see the person again. He didn't. That's exculpatory. They sat on that. That was never disclosed until the file got opened. We saw that, and we saw the arrest photos. It's a whole new ballgame. Thank you very much, Mr. Radovsky. Thank all the counsel for an exceptionally well-argued and well-briefed case. Thank the state for appearing as amicus. We'd ask that a transcript be prepared, that the district attorney's office arrange for that for covering the cost of this, and we'd like to greet all three arguing counsel at sidebar to thank them.